**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 31, 2012

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v              No. 140147

JAMES EUGENE GRISSOM,

   Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

MARILYN KELLY, J.

  This case presents the question whether newly discovered impeachment evidence can constitute grounds for a new trial and, if so, under what circumstances. Defendant seeks a retrial on the basis of the newly discovered impeachment evidence. The trial court and the Court of Appeals concluded that this evidence cannot be used as a basis for granting a new trial because, in part, it is impeachment evidence. The Court of Appeals also concluded that the evidence did not warrant a new trial because if it were admitted on retrial, there was no reasonable chance of a different result.

We hold that impeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth in *People v Cress*.[1] We further hold that a material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial. It may be of a general character and need not contradict specific testimony at trial. Also, the evidence must make a different result probable on retrial. Accordingly, we vacate the Court of Appeals' judgment and remand this case to the trial court for determination of whether the newly discovered evidence satisfies *Cress*.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. THE COMPLAINANT'S STORY AND DEFENDANT'S CONVICTIONS

This case involves an alleged rape that occurred in 2001. The complainant testified that on May 12, 2001, she drove her van into the parking lot of the Fort Gratiot Meijer store between noon and 12:30 p.m. She claimed that she stepped out and turned to retrieve her purse from between the front seats. While she did so, a man with long dirty hair, a scraggly beard, and a hat appeared in front of the open door. He grabbed her arm and ordered her into the van. She testified that she resisted him, but the man struck her, causing her to fall inside. She continued to resist, but after being struck again, briefly lost consciousness.

When she regained her senses, her head was between the front seats, one of her legs was pinned by the man, and the other was pinned by the steering wheel. The man unbuttoned her pants and pulled them and her underwear down around her knees. He

---

[1] *People v Cress*, 468 Mich 678; 664 NW2d 174 (2003).

then unzipped his own pants and she saw his erect penis. The man again struck her several times with his hand and stated, "This will shut you up." He slid a ring with several stones on it down one of his fingers to the knuckle and, she testified, forced that finger into her vagina.

The complainant claimed that she attempted to scream but could not because, after the man struck her, she was having difficulty breathing. However, she was able to call the man a "bastard" and he responded by backhanding her. The complainant indicated that she could taste blood from a cut on her face. She claimed that the man then inserted his penis into her vagina while gripping and striking her thighs as she continued to resist. The complainant testified that she again lost consciousness, but when she revived, her attacker was gone. She claimed that she found her way home, but was unable to recall the details of how she got there. When she arrived home, she immediately went into her bedroom because she did not want her children to know what had happened.

The complainant's husband testified that he knew that something was wrong when she returned home. He claimed that the complainant looked panicked and had a cut on her mouth. He questioned her about what had happened, and the complainant indicated in an incoherent and rambling manner that she had been physically attacked. However, she did not mention having been sexually assaulted. She testified that she did not tell her husband about the sexual assault because she "wasn't ready to face [her]self" and "didn't know how to break [her husband's] heart." The complainant's husband testified that he noticed large bruises developing on her legs and arms over the days following the attack.

On May 14, 2001, two days following the attack, the complainant reported the assault to the police. Again, she did not report its sexual nature and the police treated the

3

incident as an attempted carjacking. However, the police did note a large scratch on the complainant's face and that she told them she had extensive bruising. The complainant testified that she did not report the extent of the attack to the police because she had not yet fully disclosed the details of the assault to her husband.

Also on May 14, 2001, the complainant received medical treatment from Dr. Paul Jerry for some of her injuries. Jerry testified that he observed that the complainant's arm was swollen and bruised and that she reported tenderness in her neck. She testified that she did not report the sexual assault to Jerry because she was uncomfortable talking to him near other beds. She said she did not think reporting it would be helpful given that she had since showered.

On May 15, 2001, the complainant told someone for the first time that she had been sexually assaulted. The friend she spoke to described her as traumatized and advised her to disclose the sexual nature of the assault to her husband. The complainant thereafter told her husband that she had been digitally penetrated. However, she claimed that she did not disclose further details because of his reaction.

On May 16, 2001, the complainant was seen by Dr. Deborah Russell, her gynecologist. She reported the full account of the attack, including the penile penetration. She explained that because her attacker had not worn a condom, she was concerned about possible health-related issues. Russell directed the complainant to return to the hospital emergency room because doctors there would be better able to treat her for a sexual assault.

On Russell's advice, the complainant returned to the hospital along with her husband. She was treated by Dr. Thabit Bahhur. Because her husband was present and

4

she had not yet told him the nature of the assault, she told Bahhur only that she had been digitally penetrated. Bahhur observed abrasions on the outside and inside of the complainant's vagina, as well as on her cervix. He testified that the abrasions were consistent with forceful digital or penile penetration but he could not rule out other causes of the injuries. He did not collect evidence for a "rape kit" because of how much time had elapsed since the alleged attack. Also, the complainant had changed clothes and reported only a digital penetration. Additionally, the complainant had thrown away all the clothing she had worn during the alleged assault before it could be tested. She admitted that she knew at the time that it could have been tested for DNA evidence.

One week later, on May 23, 2001, the complainant returned to Russell for a follow-up examination that revealed bruising on her legs and arm, as well as abrasions along her inner labia. Russell opined that the complainant's vaginal area was normal at the time, but noted that the "vaginal area heals very quickly," so any abrasions more than a few days old would have healed.

Several months elapsed before the complainant told her husband the full account of her alleged assault.

Thirteen months after the alleged rape, in June 2002, the complainant reported to the police that she was driving near the Fort Gratiot Meijer when she saw a black Jeep leave a driveway. While it was behind her stopped at a traffic light, she said that she recognized the person she believed to be her assailant in her rearview mirror. She indicated that the driver had scraggly hair, a beard, and a ring on his hand. It was then that she notified the police for the first time that she had been sexually assaulted. She did

this, she claimed, because she did not want to live in fear and believed that she might be able to "get the person off the street who hurt [her] . . . ."

Over a five-day period in October 2002, the complainant reviewed more than 7,500 photographs at the police station. She identified her attacker in one picture. That person was defendant. Sometime afterward, police officers interviewed defendant. He initially denied owning a ring like the one described by the complainant, although he later admitted that he had owned such a ring but had pawned it.

On November 7, 2002, the police arranged a corporeal lineup at which the complainant was given an opportunity to identify her assailant. Police officers advised defendant at his home that he should be at the station at a certain time. When they did so, defendant looked unkempt, with long hair and a scraggly beard. But when he arrived for the lineup, he had shaved his head and face. The complainant did not identify defendant as her attacker, instead selecting a different person from the lineup. Nonetheless, defendant was charged with two counts of criminal sexual conduct involving the use of force or coercion and resulting in personal injury to the victim.[2]

Several months before trial, the complainant claimed to have remembered that her attacker had a skull tattoo on his upper arm, although she did not recall any other details about it. Nor had she recalled the tattoo when the lineup was held or on any other occasion. Trial testimony established that defendant had a skull tattoo on his upper arm. There was also testimony that defendant had worked at the Fort Gratiot Meijer store on the day of the assault.

---

[2] MCL 750.520b(1)(f).

A St. Clair County deputy sheriff testified that the police never made a connection between defendant and a Jeep-type vehicle that the complainant asserted she had seen him driving. Furthermore, testimony established that defendant had pawned a ring in May 2001. That was more than a year before the victim reported seeing a man in a black Jeep wearing a ring that she claimed she could positively identify.

Defendant did not testify at trial. A jury convicted him as charged of two counts of first-degree criminal sexual conduct. He was sentenced to 15 to 35 years in prison. On direct appeal, the Court of Appeals affirmed his convictions.[3] We denied his application for leave to appeal.[4]

## B. THE NEWLY DISCOVERED EVIDENCE

Two years after defendant's convictions, the complainant called one of the detectives who had investigated the case against defendant. She informed him that she had been sexually assaulted by her brother and her father when she was a child. Another officer spoke with the complainant, who then reported having been raped in California. The prosecutor then obtained police reports from Bakersfield and Fresno, California, and provided them to defendant.

### 1. THE BAKERSFIELD, CALIFORNIA POLICE REPORTS

The first report, dated September 28, 2001, included a missing-persons form that the complainant's mother had filed with the Bakersfield police. The form indicated that

---

[3] *People v Grissom*, unpublished opinion per curiam of the Court of Appeals, issued November 18, 2004 (Docket No. 251427) (*Grissom I*).

[4] *People v Grissom*, 472 Mich 919 (2005).

7

the complainant had been having lunch at a restaurant with her mother and a friend when her cellular telephone rang. She left the restaurant with her phone but never returned. According to the officer who completed the form, L. Lerman, the complainant's mother said that it was "'out of character'" for the complainant to "just take off." She also told the police that the complainant had been raped several months earlier and since then had "not been herself."

The report also included a claim that the Bakersfield police received from the complainant's father the following day. Her father indicated that the complainant had recently called him and "told him she had been kidnaped and he needed to call the police." The police went to the father's house and asked him if he believed his daughter. He replied: "'No. I'm afraid it's just a smoke screen. My daughter likes to have a lot of attention.'" The father also told the police that the complainant had been sexually assaulted between the ages of 10 and 12 by a female member of their church congregation. He further stated that "the police were never contacted, a report was never made, and [the complainant] never received any type of counseling."

The Bakersfield police determined that the complainant had not been kidnapped, but instead had been staying with friends in Fresno, California. Officers contacted one of her friends, who indicated that the complainant "had been raped several times and 'her husband was in on it.'" The friend also explained that the complainant had been "hiding out in Colorado earlier this week, where she was assaulted by her brother." Finally, the friend noted that the complainant had alleged that her brother raped her.

The Bakersfield police reports also reflect that the complainant admitted that she had called her father to report that she had been kidnapped. She told Lerman that she had

been kidnapped by a "white male adult, late 20's, 5'9", 200 pounds, with black, curly, medium length hair, light complexion, mustache, wearing black pants and a white and blue striped shirt." Lerman indicated that the complainant claimed that the man had taken her to "a concrete block room where there were no lights or windows" and forced her to swallow six large white pills at knifepoint. Lerman also noted that the complainant "later recanted this version of the incident, stating it never occurred," and that her friends from Fresno had picked her up at the restaurant where she had been lunching with her mother and a friend.

Another Bakersfield police investigation "revealed a possible assault had taken place against [the complainant], as she had some injuries consistent with a sexual assault." Lerman again interviewed the complainant, who claimed that she had been accosted by "a white male adult, with short, black hair, wearing a green and gray mask, which covered his mouth, chin and nose; dirty jeans; and a short-sleeve shirt with the sleeves rolled up." The complainant further claimed that the man had raped her "between two cars parked in the parking lot" of the restaurant and that she had been sexually assaulted at a Colorado motel while traveling to California. However, Lerman noted that the complainant provided no details regarding the assault and was "very uncooperative." She also refused to submit to a sexual-assault examination at a hospital.

The complainant also told Lerman that the 15-minute attack had occurred while she was outside the restaurant before entering and eating with her family. Lerman asked the complainant's mother if her daughter had appeared to be upset while they were having lunch, and her mother said that her daughter seemed fine. Lerman asked a colleague if he believed the complainant needed "psychiatric evaluation."

9

Lerman later contacted one of the complainant's friends in Fresno. The friend explained that she had picked up the complainant at the restaurant on the day of the complainant's disappearance. The friend also indicated that the complainant "made no mention of a sexual assault at that time." When Lerman told the friend that the complainant had alleged that she had been kidnapped, taken to an unknown location, and given pills, the friend said: "That is not true. That is so untrue. That never happened." When Lerman asked her why she believed the complainant would tell Lerman such a thing, the friend stated, "I have no idea."

The second Bakersfield police report, dated October 1, 2001, indicated that on the previous day, the complainant appeared at an emergency room in a California hospital and announced that she had been raped. Bakersfield Police Officer A. Gavin talked with her at the hospital. She told him that she had been accosted by

> a Hispanic male, late 20's to early 30's, 5'6", 180 pounds, medium build, with black, curly hair, short in front and long in back, last seen wearing a green plastic, surgical type mask over his face, a light blue work shirt with no emblem on it, with the sleeves rolled up, dirty in appearance, dirty blue jeans and dirty tennis shoes.

Gavin's report further stated:

> [The complainant] said when they reached the south parking lot of the restaurant, she saw two vans parked next to each other. The suspect then pushed her in between these two vans. She said the suspect was wearing a small, hand-held, gray flashlight hooked on his belt with some type of leather strap. [The complainant] said he removed the flashlight from his belt with his right hand, reached down the front of her pants, and moved her underwear aside. He then inserted the flashlight into her vagina. I asked [the complainant] what she was wearing when this occurred and she told me it was the same clothing she was currently wearing. She told me she had not changed clothing since the incident occurred. I asked [the complainant] if she had showered or douched and she said she had taken one shower since the incident. I asked [the complainant] if the suspect said

10

anything to her when he was putting the flashlight into her vagina and she said he never said anything. She said he did this for a few seconds and he then removed the flashlight and inserted one of his fingers inside her vagina.

[The complainant] said she began screaming and the suspect yelled at her to stop screaming. She said he undid his pants and exposed his erect penis. He was able to move her pants and underwear aside and insert his penis into her vagina. [The complainant] said she began hitting him and he put his hands on her thighs and tried to keep her from squirming around. She said she screamed again and the suspect ran south through the parking lot toward the businesses located south of the restaurant. She never saw a vehicle. [The complainant] said the suspect did not ejaculate inside her vagina.

[The complainant] said she does not believe she could identify the suspect again if she were to see him again because he was wearing some type of mask over his face. She described this mask as green and said it reminded her of a mask a gardener or doctor might wear.

I asked [the complainant] what happened after the suspect fled and she said she retrieved her purse from the sidewalk in front of the restaurant where she had dropped it. She then went back inside the business and sat with her mother and two aunts and acted like nothing happened. [The complainant] said she ordered a cup of tea and sat silently while the three others conversed. I asked her why she did not say anything to her family and she said she was in shock. I asked [the complainant] if her family members would find it odd that they had made lunch arrangements, but she had not ordered any lunch and sat silently while the other three women socialized. She said that was typical behavior for her.

I asked [the complainant] why she was afraid to tell her family, the police, or anyone else about the incident in the parking lot. She told me she was afraid no one would believe her because this had happened once before. She told me approximately six months ago, while in Michigan, she had been raped in the parking lot of a grocery store while getting out of her vehicle. [The complainant] said she was in shock and could not believe it had happened again.

The complainant also told Gavin that she had met her Fresno friend through an online rape support group. She explained that she had joined the group *before* being raped in Michigan because she had been "raped when she was six years old." She further

11

explained that she had been "in and out of support groups and therapy for years." However, Gavin's report noted that the complainant's husband expressed "a difficult time believing [the complainant] was telling the truth."

## 2. THE FRESNO, CALIFORNIA POLICE REPORT

The third and final report was made by the Fresno Police Department. That report stemmed from a friend expressing concern about the complainant's allegations. The friend stated that the complainant was "possibl[y] mentally unstable and may try to file false allegations . . . ." The report also reflected that the complainant had met one of her Fresno friends "about 18 months ago online and has been talking to her online and on the phone since then." It further stated:

> [The complainant], who is from an unknown city in Michigan, claims that approximately 18 months ago, her brother and his friends gang-raped her. She reported this crime and the suspects were arrested and convicted.

> She states that her brother got out of jail a week ago and found her in Colorado, where she was staying with her husband to hide from her brother. [The complainant] told [a friend] that her brother raped her again on Monday and was not supposed to know where she and her husband were.

The Fresno police officer who completed this report believed that the complainant had lied to her Fresno friends, her family, and law enforcement. The report concluded that "[the complainant] told her family and Bakersfield [Police Department] she was being held against her will in Fresno, which was not true. [The complainant] is possibly mentally unstable."

## C. PROCEDURAL HISTORY OF THIS APPEAL

Armed with these newly discovered police reports, in March 2006 defendant filed a pro se motion for relief from the judgment and requesting a new trial. The trial court denied the motion. The court acknowledged that the newly discovered evidence would have been admissible at trial to test the complainant's credibility. But the court concluded that it was bound by several Court of Appeals decisions holding that newly discovered impeachment evidence cannot be the basis for granting a new trial.

The Court of Appeals denied defendant's application for leave to appeal.[5] We remanded the case to the Court of Appeals for consideration as on leave granted, directing it "to consider whether defendant has a reasonably likely chance of acquittal in light of the newly discovered evidence and in light of the evidence presented against defendant that did not involve the complainant's credibility."[6]

On remand, the Court of Appeals majority held that newly discovered evidence cannot form the basis for granting a new trial if its sole purpose is to impeach a witness's credibility.[7] It also held that, even if the newly discovered evidence were admissible and could have provided a basis for granting a new trial, defendant had no reasonable chance

---

[5] *People v Grissom*, unpublished order of the Court of Appeals, issued July 2, 2007 (Docket No. 274148).

[6] *People v Grissom*, 480 Mich 1140 (2008).

[7] *People v Grissom*, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2009 (Docket No. 274148), p 10 (*Grissom II*). The Court of Appeals majority cited *People v Duncan*, 414 Mich 877 (1982), and *People v Davis*, 199 Mich App 502, 516; 503 NW2d 457 (1993), for the proposition that newly discovered impeachment evidence cannot be the basis for a new trial.

13

of acquittal.[8]  It opined that there was other evidence supporting defendant's conviction that was not dependent on the complainant's credibility.[9]  Therefore, the Court affirmed the trial court's denial of defendant's motion for relief from the judgment.

Judge GLEICHER dissented.  She opined that defendant was reasonably likely to be acquitted on retrial in light of the newly discovered evidence.[10]

We granted defendant's application for leave to appeal.[11]

## II. ANALYSIS

We review for an abuse of discretion a trial court's decision to grant or deny a motion for new trial.[12]

## A. LEGAL BACKGROUND

Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence.[13]  This policy is consistent with requiring parties to "'use care, diligence, and vigilance in securing and presenting evidence.'"[14]  We have identified several evaluative criteria to apply when determining whether a new trial may

---

[8] *Grissom II*, unpub op at 11.

[9] *Id*.

[10] *Id*. at 15 (GLEICHER, J., dissenting).

[11] *People v Grissom*, 488 Mich 1031 (2011).

[12] *People v Andrews*, 360 Mich 572, 578; 104 NW2d 199 (1960).

[13] See, e.g., *People v Pizzino*, 313 Mich 97, 109; 20 NW2d 824 (1945), citing *Canfield v City of Jackson*, 112 Mich 120, 123; 70 NW 444 (1897).

[14] *Pizzino*, 313 Mich at 109, quoting *Canfield*, 112 Mich at 123 (citations and quotation marks omitted).

be granted because of newly discovered evidence. We have explained that a defendant must show that

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.[15]

This test has been applied consistently for more than a century.[16]

In *Spray v Ayotte*, the Court added a caveat to the four-part test in the context of newly discovered *impeachment* evidence, noting that "[o]rdinarily a new trial will not be granted because of newly discovered evidence to impeach a witness."[17] Like the traditional four-part test, *Spray*'s caveat has also endured since its inception.[18]

---

[15] *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (citations and quotation marks omitted).

[16] See, e.g., *People v Clark*, 363 Mich 643, 647; 110 NW2d 638 (1961); *Canfield*, 112 Mich at 123.

[17] *Spray v Ayotte*, 161 Mich 593, 595; 126 NW 530 (1910).

[18] See, e.g., *Luckhurst v Schroeder*, 183 Mich 487, 499-500; 149 NW 1009 (1914) ("Ordinarily, the court will not grant a new trial on the ground of newly discovered evidence where that evidence is for the purpose of impeachment."), citing *Spray*, 161 Mich at 593-595; *People v Serra*, 301 Mich 124, 133; 3 NW2d 35 (1942) ("A new trial will not ordinarily be granted because of newly-discovered evidence to impeach a witness."), citing *Spray*, 161 Mich 593; see also *People v Barbara*, 400 Mich 352, 363; 255 NW2d 171 (1977) ("Generally, too, where the new evidence is useful only to impeach a witness, it is deemed merely cumulative."). Thus, if merely cumulative, newly discovered evidence would not satisfy the four-part test for granting a new trial. Nonetheless, *Barbara* noted that new impeachment evidence was "particularly significant when . . . the only evidence that an offense was ever committed was largely based on the testimony of individuals whose credibility might be put into question by these new witnesses." *Barbara*, 400 Mich at 363-364.

Recently, in *People v Armstrong*, we reconsidered the significance of impeachment evidence and its use as grounds for granting a new trial.[19] We concluded that a defense attorney's failure to introduce telephone records that contradicted the complainant's trial testimony amounted to ineffective assistance of counsel and was sufficient for a new trial. We specifically noted the importance of evidence attacking the complainant's credibility because "[t]he defense's whole theory of the case was that the complainant had falsely accused defendant of rape. The attacks on the complainant's credibility at trial were inconclusive, providing mere 'he said, she said' testimony contradicting the complainant's version of the events."[20] Thus, the impeachment evidence was found to be sufficiently important to the determination of guilt or innocence that it could change the result on retrial. In these circumstances, we held that a defendant might be entitled to a new trial.

Federal courts have employed an approach similar to Michigan's with respect to newly discovered impeachment evidence. For example, the United States Court of Appeals for the Seventh Circuit has opined, "Of course it will be the rare case in which impeaching evidence warrants a new trial, because ordinarily such evidence will cast doubt at most on the testimony of only one of the witnesses."[21] Yet the Seventh Circuit recognized that merely because

---

[19] *People v Armstrong*, 490 Mich 281; 806 NW2d 676 (2011).

[20] *Id*. at 291.

[21] *United States v Taglia*, 922 F2d 413, 415 (CA 7, 1991).

16

[t]he practice has been to deny new trials where the only newly discovered evidence was impeaching[,] . . . the practice should not be taken to imply *a rule* that even if the defendant proves that his conviction almost certainly rests on a lie, the [trial] judge is helpless to grant a new trial."[22]

The Court further noted that

[i]f the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he *had lied consistently in a string of previous cases*, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.[23]

Thus, newly discovered evidence that impeaches a witness's testimony with false statements made in other cases is expressly permitted under *Taglia*.

Likewise, the United States Court of Appeals for the Third Circuit has held that "[trial] courts do not and should not ignore a claim that there has been a miscarriage of justice just because the newly discovered evidence supporting the claim could be categorized as impeachment in character."[24] Rather, "[w]hen asked to grant a new trial solely on the basis of new impeachment evidence, a court carefully should examine whether the defendant has demonstrated the necessary exculpatory connection between the evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence."[25] In evaluating this evidence, the Third Circuit noted that "[t]here must be something more, i.e. a factual link between the

---

[22] *Id*. (emphasis added).

[23] *Id*. (emphasis added).

[24] *United States v Quiles*, 618 F3d 383, 391 (CA 3, 2010).

[25] *Id*. at 392.

heart of the witness's testimony at trial and the new evidence. This link must suggest directly that the defendant was convicted wrongly."[26] Other circuits and authorities have reached similar conclusions.[27]

And in *White v Coplan*,[28] the United States Court of Appeals for the First Circuit explicitly rejected the notion that impeachment evidence lacks the power to alter a jury verdict. It held:

> In this case, [the defendant's] evidence was not merely "general" credibility evidence. That label applies to the traditional proofs—offered through character or reputation witnesses and sometimes through proof of specific instances of misbehavior, especially prior convictions—to support an inference that the witness has a tendency to lie. Once a staple of trials, modern evidence rules . . . have significantly restricted such evidence without totally precluding it in all cases.
>
> The evidence in this case was considerably more powerful. The past accusations were about sexual assaults, not lies on other subjects; and while sexual assaults may have some generic similarity, here the past accusations by the [witnesses] bore a close resemblance to [their] present testimony—in one case markedly so. In this regard the evidence of prior allegations is unusual.

---

[26] *Id.*

[27] See, e.g., *United States v Davis*, 960 F2d 820, 825 (CA 9, 1992) ("[N]ewly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible."). *Davis* allowed the introduction of impeachment evidence that was entirely immaterial to the witness's testimony at trial. As an example of newly discovered evidence that would warrant granting a new trial, *Davis* stated, "If newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the interest of justice would support a new trial." *Davis*, 960 F2d at 825 (quotation marks omitted).

[28] *White v Coplan*, 399 F3d 18 (CA 1, 2005).

If the prior accusations were false, it suggests a pattern and a pattern suggests an underlying motive (although without pinpointing its precise character). The strength of impeachment evidence falls along a continuum. That a defendant told lies to his teacher in grade school is at one end; that the witness was bribed for his court testimony is at another. Many jurors would regard a set of similar past charges by the [witnesses], if shown to be false, as very potent proof in [the defendant's] favor.

This "if," of course, is the heart of the matter. If the witness were prepared to admit on the stand that a prior accusation of similar nature was false, it is hard to imagine good reason for excluding the evidence. Prior admitted lies of the same kind in similar circumstances could powerfully discredit the witness. No time-consuming excursion beyond the witness would be required. Further, the accusation being conceded to be untrue, inquiry would not require the witness to admit to prior sexual activity or assault.[29]

*White*'s analysis stands as strong recognition of the utility of impeachment evidence in the context of prior false accusations. The newly discovered evidence in that case did not directly contradict the witnesses' testimony at trial. It was nonetheless held sufficient to warrant a new trial because it significantly undermined the victims' credibility on the question of whether the crime ever occurred.

Finally, the United States Supreme Court has recognized the significance of newly discovered impeachment evidence. In *Napue v Illinois*, the Court stated that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[30]

---

[29] *Id*. at 24-25.

[30] *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959).

It bears emphasizing that, as this Court recognized more than a century ago, newly discovered impeachment evidence ordinarily will not justify the grant of a new trial. Our decision today, therefore, does not disturb this unremarkable statement. It will be the rare case in which (1) the necessary exculpatory connection exists between the heart of the witness's testimony at trial and the new impeachment evidence and (2) a different result is probable on retrial.[31] But when that rare case presents itself, a court should not refuse to grant a new trial solely on the ground that the newly discovered evidence is impeachment evidence. It should not refuse even if the new evidence is not directly contradictory to specific trial testimony.[32]

---

[31] See *Quiles*, 618 F3d at 392.

[32] The dissent relies on *Spray* and 29 Mack, Cyclopedia of Law & Procedure, pp 918-921, for the proposition that "newly discovered evidence that contradicts particular and material statements in a witness's testimony could potentially satisfy [the *Cress*] factors for granting a new trial, as opposed to newly discovered evidence that only serves to impeach a witness's credibility." *Post* at 6. This misstates *Spray*'s holding. *Spray* stands only for the uncontroversial proposition that, generally, a new trial will not be granted because of newly discovered impeachment evidence.

Nor does the Cyclopedia of Law & Procedure support the limitation the dissent places on newly discovered impeachment evidence. The treatise makes no reference to a need for the evidence to specifically contradict particular statements. The treatise states that "[n]ewly discovered evidence to successfully contradict a witness upon a material matter may be cause for allowing a new trial, and it is no objection to such allowance that the evidence may incidentally impeach a witness." Our holding is entirely consistent with this statement. Accordingly, the entire basis for the dissent's conclusion that the newly discovered evidence does not make a different result probable on retrial is based on a flawed and baseless assumption: that this evidence must contradict a particular statement in a witness's testimony. It is telling that the prosecution conceded in its brief to this Court that "neither this Court nor the Court of Appeals has ever indicated that the entire entry from the Cyclopedia has been incorporated into Michigan law." In any event, the dissent judicially engrafts the word "particular" onto the passage quoted from

20

In sum, there is ample authority that undercuts the Court of Appeals' conclusion that newly discovered impeachment evidence can never be grounds for a new trial. Rather, impeachment evidence may be grounds for a new trial if it satisfies the four-part test set forth in *Cress*. More specifically, newly discovered impeachment evidence satisfies *Cress* when (1) there is an exculpatory connection on a material matter between a witness's testimony at trial and the new evidence[33] and (2) a different result is probable on retrial.[34]

The Court of Appeals majority in this case relied on *People v Duncan*[35] and *People v Davis*[36] for the proposition that newly discovered impeachment evidence is never grounds for a new trial. *Duncan* was a mere peremptory order of this Court. The Court of Appeals dissenting opinion whose reasoning this Court adopted in *Duncan* did

---

the treatise and, in doing so, gives the 100-year-old passage a meaning its authors never imagined.

In sum, there is no precedent, in Michigan or elsewhere, recognizing such a limited utility for newly discovered impeachment evidence. The dissent has no authority for its claim that newly discovered impeachment evidence can be considered only if it directly contradicts a particular statement in a witness's testimony.

[33] See *Quiles*, 618 F3d at 392.

[34] See *Cress*, 468 Mich at 692. The prosecution contends that for newly discovered impeachment evidence to satisfy *Cress*, it must directly contradict a witness's testimony at trial. We disagree. There is no precedent in Michigan for such a narrow interpretation of the proper scope of newly discovered impeachment evidence.

[35] *Duncan*, 414 Mich 877.

[36] *Davis*, 199 Mich App at 516.

not impose a blanket prohibition on granting a new trial because of newly discovered impeachment evidence.[37]

*Davis*'s alleged prohibition of new trials based on newly discovered impeachment evidence can be traced to the 1967 Court of Appeals decision in *Graham v Inskeep*.[38] Yet *Graham* employed language consistent with our rule today, noting that "it is *generally* held that a new trial will not be granted if the newly-discovered evidence is merely to impeach."[39]  *Graham* left open the possibility that there may be circumstances under which newly discovered impeachment evidence warrants a new trial.  Thus, *Graham*'s progeny transformed a *general* rule into a *per se* one.  To the extent that any Michigan decisions impose a per se prohibition against granting a new trial in light of newly discovered impeachment evidence, they are hereby overruled.[40]

## B. THE TRIAL COURT ABUSED ITS DISCRETION

As discussed earlier, granting a new trial on the basis of newly discovered evidence requires a defendant to show that (1) the evidence itself, not merely its materiality, is newly discovered, (2) the newly discovered evidence is not cumulative, (3) using reasonable diligence, the party could not have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial.

---

[37] See *People v Duncan*, 96 Mich App 614, 618-620; 293 NW2d 648 (1980) (R. B. BURNS, P.J., dissenting).

[38] *Graham v Inskeep*, 5 Mich App 514; 147 NW2d 436 (1967).

[39] *Id*. at 523 (emphasis added; quotation marks omitted).

[40] See, e.g., *People v Sharbnow*, 174 Mich App 94; 435 NW2d 772 (1989); *People v Snell*, 118 Mich App 750; 325 NW2d 563 (1982).

In this case, the prosecution did not contest the first three of these criteria in the lower courts. It conceded that the evidence was newly discovered, not cumulative, and that defendant could not have discovered and produced it at trial using reasonable diligence.[41]

However, the trial court abused its discretion by denying defendant's motion for relief from the judgment. It ruled that impeachment evidence "cannot form the basis for . . . grant[ing] . . . a new trial." This ruling was legally incorrect. Accordingly, the trial court's ruling was necessarily an abuse of discretion.

On remand, defendant is entitled to have the trial court carefully consider the newly discovered evidence in light of the evidence presented at trial. The trial court must evaluate the new evidence and determine whether there exists an exculpatory connection between it and the heart of the complainant's testimony. The only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record.

## III. CONCLUSION

We hold that newly discovered impeachment evidence generally is insufficient to warrant a new trial. However, such evidence may be grounds for a new trial if it satisfies

---

[41] The prosecution argues before this Court for the first time that defendant's newly discovered evidence is merely cumulative and thus does not satisfy the four-part test. This issue is unpreserved, but in any event, it lacks merit. The newly discovered evidence is not cumulative because at trial defendant did not impugn the complainant's credibility with evidence that she had made previous false rape accusations. Defendant was unable to present "evidence of the same kind to the same point" at trial. *Murray v Weber*, 92 Iowa 757, 758; 60 NW 492 (1894). Thus, the prosecution's initial concession was correct because defendant's newly discovered evidence is not cumulative.

23

the four-part test set forth in *Cress*. Newly discovered impeachment evidence concerning immaterial or collateral matters cannot satisfy *Cress*. But if it has an exculpatory connection to testimony concerning a material matter and a different result is probable, a new trial is warranted. It is not necessary that the evidence contradict specific testimony at trial. Because the trial court did not have the benefit of this clarification of the role of newly discovered impeachment evidence, a remand for application of the standards clarified here is appropriate.

For these reasons, we reverse the Court of Appeals' judgment. We remand the case to the trial court for a determination of whether the newly discovered evidence satisfies *Cress*. The only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record. The trial court's determination is to be made and communicated to this Court within 60 days of the date of this opinion.

We retain jurisdiction.

Marilyn Kelly
Michael F. Cavanagh
Stephen J. Markman
Diane M. Hathaway

24

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                No. 140147

JAMES EUGENE GRISSOM,

      Defendant-Appellant.

_____

MARILYN KELLY, J. (*concurring*).

Although I am willing to agree to remand this case to the trial court for application and resolution of the *Cress* test, I believe this Court should do that itself. Hence, I write separately to explain why.

First, this appeal has lingered unresolved in the state appellate courts for the past six years. This Court already considered and remanded it once before during that period. The parties have now diligently, thoroughly, and thoughtfully briefed and argued the question whether defendant should be afforded a new trial. Not only is it appropriate for us to give them an answer, there is no impediment to our doing so.

Second, the rationale for a remand to the trial court rests in large part on the theory that the judge there has the benefit of having tried the case. The trial judge would normally have superior knowledge of the facts that were presented at trial. He or she would apply that knowledge to the question of whether a different result is probable on retrial were the newly discovered evidence to be admitted. But in this case, the trial

judge has retired from the bench, and this Court's remand will go to a judge who in all likelihood knows nothing of the facts of this case.

Third, in granting defendant's application for leave to appeal, we specifically ordered the parties to address whether the newly discovered evidence warrants a new trial. Hence, it follows that we should attempt to resolve the issue.

Lastly, by resolving the issue, the Court can establish precedent on the question of when newly discovered impeachment evidence can satisfy the fourth *Cress* factor.

Nonetheless, I fully join the majority opinion. I write separately to definitively answer the question on which we granted defendant's application for leave to appeal: I would hold that the newly discovered evidence constitutes material exculpatory evidence and that it makes a different result probable on retrial, satisfying the fourth *Cress* factor. Accordingly, my preference would be to vacate defendant's convictions and remand the case for a new trial.

## I. ANALYSIS

As discussed in my majority opinion, granting a new trial on the basis of newly discovered evidence requires a defendant to show that (1) the evidence itself, not merely its materiality, is newly discovered, (2) the newly discovered evidence is not cumulative, (3) using reasonable diligence, the party could not have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial.[1] Because the prosecution correctly conceded that defendant has satisfied the first three

---

[1] *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).

factors, the only remaining question is whether the newly discovered evidence makes a different result probable on retrial.  I would answer that question in the affirmative.[2]

## A. ADMISSIBILITY OF THE NEWLY DISCOVERED EVIDENCE

Merely presenting a court with newly discovered evidence does not automatically support the grant of a new trial.  Rather, to potentially effect a different result on retrial and thereby satisfy the fourth *Cress* factor, the newly discovered evidence must be admissible.  Thus, a question prefatory to the trial court's resolution of whether defendant's newly discovered evidence would make a different result probable on retrial is whether that evidence could be admissible.  The Court of Appeals majority hinted that it could be admissible in limited circumstances, namely, to show that the complainant admitted she had lied about being kidnapped and about being raped in California.  It also noted that the California police reports contain hearsay,[3] which is generally not

---

[2] In *Graham v Inskeep*, 5 Mich App 514, 524; 147 NW2d 436 (1967), the Court of Appeals opined that trial courts are generally in the best position to determine whether newly discovered evidence would tend to produce a different result on retrial.  *Graham* reasoned that trial courts are in closest contact with the parties.  They have tried the case, have heard the relevant witnesses' testimony, and are therefore in the best position to evaluate the proper weight to be afforded newly discovered evidence.  However, the judge who presided over defendant's trial and denied defendant's motion for relief from the judgment has retired.  Thus, *Graham*'s reasoning has no applicability here.  There is no legitimate reason to remand this case to the trial court for assignment to a new judge unfamiliar with its lengthy history, factual background, and legal intricacies.  Thus, the dissent's claim that "[t]he trial court possesses a superior ability to assess in the first instance the strength and importance of the newly discovered evidence in relation to the evidence presented at trial," *post* at 22, is unfounded.

[3] MRE 801(c) defines "hearsay" as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

admissible under MRE 802. I conclude that, at the very least, the reports have evidentiary value and contain information that could be admitted if properly presented.

First, on retrial, if the complainant were to deny having ever made a false police report of rape, the fact that she did so in California in 2001 could be admissible. Under MRE 613, this inconsistency would be relevant to her credibility. If she were to testify that she made the false report, it would also severely impeach her credibility. The veracity of her testimony was vital to defendant's convictions.

Second, the newly discovered evidence is relevant. In this regard, MRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Accordingly, parts of the newly discovered evidence could be admissible to show that the complainant had a motive for falsely reporting a sexual assault. It could show that she engaged in a scheme consisting of falsely accusing various individuals of raping her. The police reports show that the complainant reported to the police, family, or friends that she

4

had been raped by at least eight different people on at least nine separate occasions.[4]

Thus, MRE 404(b) could be yet another basis for the introduction of information contained in the California police reports.[5]

Third, the newly discovered evidence has evidentiary value because, on retrial, it may permit defendant access to the complainant's medical, counseling, and psychological records. This could include records from the online rape support group that the complainant participated in *before* the alleged rape by defendant in this case. The trial court denied defendant's motion for discovery of these records at trial, and the Court of Appeals affirmed this decision,[6] citing MCR 6.201(C)(2)[7] and *People v Stanaway*.[8]

---

[4] These instances include (1) an alleged rape in Michigan when the complainant was 6 years old, (2) an alleged sexual assault by a female member of the complainant's church congregation when the complainant was between 10 and 12 years old, (3) alleged sexual assaults by the complainant's brother when she was a child, (4) alleged sexual assaults by the complainant's father when she was a child, (5) the alleged rape by defendant in this case, (6) alleged rapes in California that her husband and brother were "in on," (7) the alleged rape that occurred in a California parking lot, (8) the recanted allegation of rape at a Colorado hotel, and (9) an alleged gang rape committed by her brother and his friends.

[5] The dissent argues, *post* at 11 n 34, that I have developed an exculpatory defense theory that the complainant engaged in a "scheme" to make false rape accusations. Not so. I have simply explained why, under MRE 404(b), evidence of the complainant's admittedly false accusations, as well as the other alleged assaults unearthed in the California police reports, might be admissible as part of a scheme, pattern, or system of making those allegations. My analysis in this regard tracks the language of MRE 404(b).

[6] *People v Grissom*, unpublished opinion per curiam of the Court of Appeals, issued November 18, 2004 (Docket No. 251427), p 4.

[7] MCR 6.201(C)(2) provides, "If a defendant demonstrates a good-faith belief, grounded in articulable fact, that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense, the trial court shall conduct an in camera inspection of the records."

[8] *People v Stanaway*, 446 Mich 643, 677; 521 NW2d 557 (1994).

5

*Stanaway* requires a defendant to establish "a reasonable probability that the privileged records are likely to contain material information necessary to his defense" before an in camera review is conducted pursuant to MCR 6.201(C)(2) to ascertain whether those records contain evidence that is "reasonably necessary to the defense . . . ."[9] It appears that the newly discovered evidence could satisfy the court rule and *Stanaway*.[10]

The rape-shield statute[11] does not apply to this evidence because it does not preclude impeaching a complainant with the complainant's prior false accusation. The statute provides that evidence of specific instances of a complainant's sexual conduct, opinion evidence of a complainant's sexual conduct, and reputation evidence of a

---

[9] *Id*. at 649, 684.

[10] *Stanaway* considered a situation in which "[t]he defense theory is that the claimant is a troubled, maladjusted [person] whose past trauma has caused her to make a false accusation . . . ." *Id*. at 682. The defendant asserted "a good-faith belief" and provided factual support for his in camera discovery motion that "the complainant suffered sexual abuse . . . before this allegation of abuse, the nonresolution of which produced a false accusation . . . ." *Id*. The Court concluded that in those circumstances, the defendant might have met the requisite standard for an in camera review. *Id*. at 683.

To be clear, I would not hold that the trial court *must* conduct an in camera review of the complainant's psychological records. Rather, consistently with *Stanaway* and MCR 6.201(C)(2), it *may* conduct a review if there is a reasonable probability that the privileged records are likely to contain information necessary to the defense.

Similarly, I do not rely on the complainant's psychological records in assessing whether defendant has met his burden of showing that a different result is probable on retrial. I simply note how the newly discovered evidence might make possible the admission of those records on remand.

[11] MCL 750.520j.

6

complainant's sexual conduct are generally inadmissible. However, in *People v Jackson*, we held that testimony concerning prior false sexual-assault allegations does not implicate the rape-shield statute.[12] And as the Court explained in *People v Hackett*,

> [t]he fact that the Legislature has determined that evidence of sexual conduct is not admissible as character evidence to prove consensual conduct or for general impeachment purposes is not however a declaration that evidence of sexual conduct is never admissible. We recognize that in certain limited situations, such evidence may not only be relevant, but its admission may be required to preserve a defendant's constitutional right to confrontation. For example, where the defendant proffers evidence of a complainant's prior sexual conduct for the narrow purpose of showing the complaining witness' bias, this would almost always be material and should be admitted. Moreover in certain circumstances, evidence of a complainant's sexual conduct may also be probative of a complainant's ulterior motive for making a false charge. Additionally, the *defendant should be permitted to show that the complainant has made false accusations of rape in the past*.[13]

---

[12] *People v Jackson*, 477 Mich 1019 (2004).

[13] *People v Hackett*, 421 Mich 338, 348; 365 NW2d 120 (1984) (emphasis added; citations omitted). The dispositive question regarding the timing of a past false rape accusation and its admissibility is not when a false rape allegation occurred relative to the case at bar. Rather, given a defendant's Sixth Amendment right to confrontation, it is sufficient that any prior false allegation occurred before a complainant testifies at trial. To hold otherwise would lead to unjust results.

Consider the following hypothetical situations. In the first situation, the complainant alleges that defendant A raped her. While the case against A is pending, the complainant makes other rape allegations against defendants B, C, and D. Then she recants her allegations against A, B, and C. It is undisputed that defendant D may cross-examine the complainant regarding her recanted allegations against A, B, and C.

In the second situation, the complainant alleges that defendant A raped her. While the case against A is pending, the complainant makes other rape allegations against defendants B, C, and D that she later recants. Under the dissent's erroneous view, defendant A would not be permitted to cross-examine the complainant regarding the false rape allegations against defendants B, C, and D. This would be because he was unfortunate enough to have been accused first. Such a result is untenable.

7

Thus, at a minimum, on retrial, the rape-shield statute would not preclude admission of the complainant's admittedly false accusation of rape made to the Bakersfield Police.

In addition, *Hackett* discussed another type of evidence of sexual conduct that, if otherwise admissible, does not run afoul of the rape-shield statute: evidence of a complainant's sexual conduct probative of a complainant's ulterior motive for making a false charge.[14] This exception may also be germane because evidence of the complainant's past false accusation and purported childhood sexual abuse could arguably suggest an underlying motive for making a false charge.[15]

In light of these evidentiary, statutory, and judicially crafted rules, if defendant properly offered the evidence, he could introduce the complainant's prior false rape claim. Potentially, he could also attempt to show that she made numerous reports of rape over the years involving many different individuals. Finally, under *Stanaway* and MCR 2.601(C)(2), the newly discovered evidence might permit defendant access to the complainant's medical, counseling, and psychological records on retrial, which were denied to him at trial. I note that this is not an exhaustive evaluation of the potential admissibility of the newly discovered evidence.[16]

---

[14] *Id.*

[15] See *White v Coplan*, 399 F3d 18, 24 (CA 1, 2005) ("If the prior accusations were false, it suggests a pattern and a pattern suggests an underlying motive . . . ."); see also *Stanaway*, 446 Mich at 682 (recognizing that a complainant's unresolved prior sexual abuse could produce a false accusation).

[16] Without *any* supporting analysis, consideration of our rules of evidence, or application of governing caselaw, the dissent states as an ipse dixit that the newly discovered evidence might not be admissible on retrial. By contrast, I have carefully outlined how at

8

## B. EXCULPATORY CONNECTION

For newly discovered impeachment evidence to satisfy *Cress*, there must be an exculpatory connection between the evidence and the offense, even if the new evidence does not contradict a witness's specific testimony. Alternatively, the evidence must totally undermine critical inculpatory evidence.[17] Hence, in evaluating this issue, a court must identify a factual link between the heart of a key witness's testimony at trial and the newly discovered evidence. I would hold that a clear exculpatory connection exists between the newly discovered evidence in this case and the heart of the complainant's testimony at trial. This is because the new evidence calls into question whether the alleged crime she testified about ever occurred.

---

least portions of the newly discovered evidence could be admissible notwithstanding the fact that hearsay is involved.

Furthermore, the dissent claims that on remand, the trial court should consider only admissible evidence when determining whether the newly discovered evidence satisfies *Cress*. This is incorrect. MCR 6.507 provides that the parties may "expand the record by including any additional materials [the court] deems relevant to the decision on the merits of the motion. The expanded record may include letters, affidavits, documents, [and] exhibits . . . ."

The dissent also indulges in considerable speculation about evidence the prosecution might seek to enter into the record on remand to defeat the grant of a new trial. I have avoided such speculation in part because it tends to lead the legal analysis far astray for no useful or appropriate purpose. And it is unavailing. For example, the dissent speculates that the prosecution may show that the complainant's false California assault claims were the product of post-traumatic stress disorder caused by defendant's alleged assault. But, of course, defendant might show that the complainant's claim against him in this case was the product of post-traumatic stress disorder caused by sexual assaults she suffered as a child.

[17] *United States v Quiles*, 618 F3d 383, 392 (CA 3, 2010).

The new evidence impeaches complainant's most incriminating testimony. Defendant's convictions were predicated on complainant's allegation that defendant sexually assaulted her. Her credibility was central to the case. But the newly discovered evidence casts serious doubt on her credibility, not just in general, but with respect to the most crucial evidence at trial: her testimony that she was brutally assaulted in a commercial parking lot in the middle of the day and that defendant perpetrated the attack.

The newly discovered police reports are highly significant because they render complainant's allegations in this case more difficult to believe. Relevant in this respect is the final version of complainant's story documented in the California police reports, the details of which bear a remarkable resemblance to this case. Both involved allegations of rape in a parking lot in the middle of the day. In both cases, no one reported seeing an assault. In both cases, no definitive physical evidence of a sexual assault was obtained because complainant did not seek immediate medical treatment. And in both cases, the complainant alleged that her attacker penetrated her with a foreign object, his finger, and then his penis.

In sum, the newly discovered evidence creates a serious question about whether any sexual assault occurred at all in this case. It discloses a history of at least one, and as many as nine, prior false sexual-assault allegations. And it raises questions about the complainant's veracity as pertains to her testimony inculpating defendant. As we noted in *People v Barbara*, new impeachment evidence is "particularly significant when . . . the only evidence that an offense was ever committed was largely based on the testimony of

10

[an] individual[] whose credibility might be put into question . . . ."[18] For these reasons, I would hold that the newly discovered evidence contains an exculpatory connection, i.e. "a factual link between the heart of the [complainant's] testimony at trial and the new evidence . . . suggest[ing] directly that the defendant was convicted wrongly."[19]

## C. A DIFFERENT RESULT IS PROBABLE ON RETRIAL

In light of these considerations, I believe that a different result is probable on retrial. First, the prosecution's case against defendant was not strong. Several months had elapsed from the date of the alleged rape by the time the complainant told her husband about it. Thirteen months elapsed before the complainant went to the police claiming that someone had raped her. Initially, she told both her husband and the police a different story—that she had been beaten. No direct physical evidence linked defendant to the crime. There was no DNA evidence and the complainant did not seek medical care until any such evidence could no longer be identified. Indeed, although the complainant admitted that she knew the clothing she wore during the alleged attack could be tested for DNA evidence, she threw it away before it could be tested.

---

[18] *People v Barbara*, 400 Mich 352, 363-364; 255 NW2d 171 (1977).

[19] *Quiles*, 618 F3d at 392. The dissent argues, *post* at 9, that "the reports do not contradict *any* evidence presented at trial, let alone *material* evidence" and that there is no exculpatory connection between the new evidence and the complainant's testimony at trial. This argument misses the point. The exculpatory connection between the new evidence in this case and the complainant's testimony at trial is that the new evidence tends to show defendant's innocence. It does that by showing that the crime the complainant accused him of might never have occurred.

11

The complainant identified someone other than defendant as her assailant at the police lineup. She did not tell two of the physicians who examined her after the alleged attack that she had been raped. There were no eyewitnesses to the alleged attack, which supposedly occurred in broad daylight in a crowded parking lot. Surveillance videotape of the Meijer parking lot did not reveal any evidence of criminal activity. Nor did it reveal that defendant or the complainant was even *present* in the parking lot on the day of the alleged assault.[20]

Second, the only evidence offered to corroborate the complainant's allegation that she suffered physical injuries that could have been signs of a rape was testimony from Dr. Thabit Bahhur and Dr. Deborah Russell. These are two of the physicians who examined her. Bahhur indicated that he observed abrasions on the outside and inside of the complainant's vagina, as well as on her cervix. Although he testified that the abrasions were consistent with a sexual assault, he specifically indicated that he could not rule out other causes of the injuries.

Similarly, Russell observed abrasions on the complainant's labia. She also reported bruises on the complainant's arms and legs. But Russell testified that the complainant's vaginal area was "normal" at the time of her exam. Thus, the testimony

---

[20] The dissent reiterates the prosecution's explanation for why the surveillance tape does not corroborate the complainant's allegations. But it is based on utter conjecture. There was no evidence that defendant ever watched, much less studied, the Meijer store surveillance system. Similarly, the dissent reasons from only one premise: that the assault definitively occurred and that the details the complainant testified about were factual.

offered by Bahhur and Russell did not establish that the complainant had been sexually assaulted, much less that defendant was her attacker.

Third, during closing argument, the prosecutor presented the complainant's allegations as setting forth a slam-dunk case, stating, "There's really, really no question as to whether or not this assault happened. There's really no question." In light of the newly discovered evidence, this is not an accurate characterization of the complainant's allegations. The newly discovered evidence creates a serious question about whether any assault occurred at all in this case. Moreover, it discloses a history of at least one, and possibly as many as nine, false sexual-assault allegations. It raises questions about the complainant's veracity. I believe that at a new trial, it is probable that a jury would find this evidence sufficiently compelling to acquit defendant.

In reaching this conclusion, I do not overlook the evidence presented at trial corroborating defendant's convictions that was not entirely independent of the complainant's credibility. This evidence includes the fact that defendant worked at the Meijer store where the alleged assault occurred. It also includes the complainant's identification of defendant in a photo array. It includes defendant's lie to the police about not having owned or pawned a ring fitting the complainant's description of her attacker's ring.[21] And it includes the fact that defendant had a skull tattoo on his right arm. Furthermore, defendant altered his appearance before his corporeal lineup. However,

---

[21] However, even this evidence raises questions about the complainant's veracity. The complainant testified that she observed someone who she thought was her assailant wearing the ring more than one year *after* defendant had pawned it. Thus, on retrial and in light of defendant's new evidence, a jury might find the complainant less credible if it believes that she was wrong about seeing defendant and the ring.

13

given the circumstantial nature of this evidence, the likelihood that a jury would acquit defendant after being presented with the newly discovered evidence is great enough to warrant a new trial.

Given these considerations, I believe defendant has set forth a sufficient basis for a new trial. As we noted in *Barbara*, new impeachment evidence is "particularly significant when . . . the only evidence that an offense was ever committed was largely based on the testimony of [an] individual[] whose credibility might be put into question . . . ."[22] That is, I believe there is a factual link between the heart of the complainant's testimony at trial and the newly discovered evidence that suggests that defendant might have been wrongly convicted.[23] I cannot say that a different result will *certainly* occur on retrial. But the newly discovered evidence undermines my confidence in the complainant's testimony, and I believe a different result is probable on retrial.

As Judge GLEICHER aptly concluded in her dissent in this case:

> In summary, the prosecutor presented the [the complainant] as an ordinary wife and mother, engaged in a routine shopping trip, whom defendant senselessly and brutally attacked. The jury remained ignorant of other highly relevant facts, including the victim's prior participation in an online rape support group, which likely would have engendered reasonable doubt regarding her delayed and inconsistent description of the attack in the Meijer's parking lot. The impeachment evidence supplied by the California police reports, and the further information likely to flow directly from additional investigation triggered by those reports, more probably than not renders the [complainant's] testimony incredible.[24]

---

[22] *Barbara*, 400 Mich at 363-364.

[23] See *Quiles*, 618 F3d at 392.

[24] *People v Grissom*, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2009 (Docket No. 274148), p 15 (GLEICHER, J., dissenting).

14

I agree. Whether a jury would believe the complainant's version of events in light of the newly discovered evidence remains an open question. I simply note the gravity of the evidence and would hold that it makes a different result probable on retrial.

## II. THE TRIAL COURT'S RULING

The majority opinion correctly holds that the trial court abused its discretion by denying defendant's motion for relief from the judgment because it ruled that impeachment evidence "cannot form the basis for . . . grant[ing] . . . a new trial."

I also believe that the trial court gave insufficient weight to the potential effect of the newly discovered evidence when considering defendant's motion for new trial. Instead, it commented on the testimony that went to the jury:

> Finally, this Court takes strong exception to defense counsel's version of the facts that came out at trial for the jury's consideration as contained in his Motion for New Trial. The statement of facts as contained in the Prosecutor's brief on this motion is much closer to my remembrance of the trial evidence. My point in commenting on this is that there was ample and strong competent evidence for the jury to convict Defendant independent of [the complainant's] testimony.

This analysis failed to recognize that the complainant's testimony was essential to defendant's convictions. And it ignores the powerful effect of the newly discovered evidence on the complainant's credibility. Accordingly, I would further hold that the trial court abused its discretion by failing to properly weigh the newly discovered evidence.

## III. CONCLUSION

I would hold that the newly discovered evidence constitutes material exculpatory evidence and satisfies the fourth *Cress* factor, making a different result probable on

15

retrial. Accordingly, my preference would be to vacate defendant's convictions and remand this case to the trial court for a new trial.


                                                    Marilyn Kelly

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                      No. 140147

JAMES EUGENE GRISSOM,

        Defendant-Appellant.

_____

MARKMAN, J. (*concurring*).

I concur with the majority that the test set forth in *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), for determining when a new trial is warranted on the grounds of newly-discovered evidence, can be satisfied by impeachment evidence. I further agree that such evidence may be of a general character and need not contradict specific testimony at trial. Rather, it is sufficient that such evidence have an exculpatory and material connection to testimony at trial, and otherwise satisfy the *Cress* test. Particularly in cases involving one-on-one credibility contests, I believe that the test adopted by the dissent may deprive a defendant of a new trial where newly-discovered evidence does not contradict specific testimony but nonetheless renders a new result probable upon retrial because no crime at all was committed. I also agree that newly-discovered impeachment evidence will only rarely justify the grant of a new trial, that this evidence cannot satisfy *Cress* if it concerns immaterial or collateral matters, and that it will be the exceptional case in which the necessary "exculpatory connection" to

testimony concerning a material matter will exist and a different result will be probable on retrial. Finally, I agree that it is appropriate to remand this case to the trial court so that it can evaluate defendant's motion for a new trial in light of our clarified *Cress* test.

I write separately, however, for two reasons. First, I wish to clarify that I do not join Justice MARILYN KELLY's concurrence with her own majority opinion for the same reason that I disagree with the dissenting opinion. Contrary to each of these opinions, I find this to be one of the most difficult and puzzling criminal cases that has come before this Court in recent years, and I am considerably less certain than my four colleagues as to how this matter should presently be resolved. I cannot join Justice KELLY's concurring opinion because, as the dissenting opinion compellingly observes, there is significant existing evidence of defendant's conduct that suggests guilt. I also cannot join the dissenting opinion because, as Justice KELLY compellingly observes, there is much about the accuser's conduct that suggests that guilt could never have been established almost exclusively on the basis of the accuser's testimony had the newly-discovered evidence been available to the jury. As a result, I am satisfied to remand to allow the trial court to assess the *entirety* of the available evidence in applying the *Cress* test.

Second, I write separately to summarize both the newly-discovered and the existing evidence that must be considered by the trial court upon remand. The trial court clearly believed that impeachment evidence could *never* establish the basis for a new trial, and therefore can be said to have abused its discretion as a matter of law. *Koon v United States*, 518 US 81, 100; 116 S Ct 2035; 135 L Ed 2d 392 (1996). Now that this Court has clarified that such evidence *can* under the proper circumstances establish such

2

a basis, a remand is appropriate for the trial court's consideration of *Cress*. A review of

the newly-discovered evidence in this case indicates the following:

-- In California, approximately four months after the reported assault at issue in this case (but before the complainant reported that assault), the complainant called her father and told him she had been kidnapped and was being held in a room with no windows. Her father told the police he did not believe the complainant, explaining that he was "afraid it's just a smoke screen" because complainant "likes to have a lot of attention." Finally, the complainant's husband told police that her clothing and toothbrush were missing.

-- Police discovered that the complainant was actually in California staying with friends, and that she had told those friends that she had been raped several times, including by her brother in Colorado, and that her husband had been "in on it."

-- When contacted by police, the complainant stated that a man and woman had kidnapped her at knife point, driven her to a concrete block room with no lights or windows, and given her six large, white pills. The complainant stated that the man robbed her of her jewelry.

-- The complainant then recanted her report of the robbery and kidnapping, stating that it "never occurred" and that her friends, whom she had met in an online rape support group 18 months earlier, had picked her up from the restaurant.

-- The complainant explained that she had joined the rape support group *before* being raped in Michigan because "she was raped when she was six years old" and "she has been in and out of support groups and therapy for years." However, the complainant's husband expressed "a difficult time believing [she] was telling the truth."

-- The complainant told the police that she had planned to spend the night with her friends without telling her husband or family and had fabricated the kidnapping story to "buy some time" to be alone.

-- The complainant then gave a third version of what happened outside the restaurant, one that was strikingly similar to the assault at issue here. The complainant told the police that she never went in the restaurant; instead, a man grabbed her, put a knife to her back, and assaulted and raped her in the

3

restaurant parking lot between two parked cars. The complainant then stated that she went in to the restaurant and had lunch with her family.

-- When asked about the complainant's reported rape in the parking lot of the restaurant, her mother reported that the complainant was never alone in the parking lot of the restaurant. Rather, the complainant had gone in the restaurant with the rest of the family and appeared fine at lunch.

-- When the complainant went to the hospital after reporting the rape in the restaurant parking lot, she told the police that the man had inserted a small, hand-held, gray flashlight into her vagina, as well as penetrating her digitally and then with his penis. The complainant said that the man wore a green mask and fled when she began screaming and hitting him. The complainant "had some injuries consistent with a sexual assault."

-- The complainant then told the police that in Colorado she had been raped by her brother's friend, who had "tracked her down" at her motel. She later recanted this story and denied that any assault had occurred in Colorado.

-- The complainant told the fiancé of her friend from the online rape support group that her brother and his friends had gang-raped her 18 months earlier and that they had been convicted. The complainant said that her brother had found her in Colorado after he was released from jail and raped her again and that she thought her husband was also involved.

-- The complainant's friend's fiancé, a police officer, reported that the complainant had lied to them, that she might be mentally unstable, and that he was worried she might raise false allegations about him.

-- As the majority opinion observes, the California police reports "show that complainant reported to police, family or friends that she had been raped by at least eight different people on at least nine separate occasions."

On remand, the trial court should consider this newly-discovered evidence in conjunction with the evidence, both inculpatory and exculpatory, that was previously offered at trial.

This includes at least the following:

-- Although the complainant claimed that defendant raped her in a Meijer parking lot during the middle of the day, no witnesses reported seeing or hearing anything at Meijer that day.

4

-- The complainant considerably delayed reporting the alleged sexual assault.

-- The complainant provided varying accounts of the alleged assault.

-- The physician who examined the complainant after the alleged assault testified that there were other possible explanations than rape for the complainant's physical injuries.

-- The complainant picked a person other than defendant out of a corporeal lineup.

-- The complainant claimed that she believed she saw defendant wearing the gold ring he wore during the alleged assault more than a year after defendant had pawned the ring.

-- Although the complainant admitted that she knew that DNA evidence could be obtained from clothing, she threw away all the clothing she had worn during the alleged assault.

-- Defendant was employed at the store at which the assault allegedly occurred and worked on that date, with his shift beginning shortly after the assault allegedly took place.

-- The complainant identified defendant after viewing more than 7,500 photographs.

-- The complainant described her attacker as having a skull tattoo on his upper right arm, and defendant had such a tattoo on his upper right arm.

-- Defendant lied about owning and pawning a ring that fit the complainant's description of her attacker's ring.

-- Defendant dramatically altered his appearance shortly before his corporeal lineup.

-- Medical and lay testimony reflected that the complainant suffered injuries to her face, shoulder, neck, arms, thighs, and vagina that were consistent with her testimony that she had been sexually assaulted.

When applying the *Cress* factors to a motion for a new trial, the trial court may consider only two classes of evidence: the claimed newly-discovered evidence and the evidence

presented at the previous trial. Any evidence that falls outside these classes is plainly beyond the scope of the *Cress* process.

Precisely because of the very considerable strengths and the very considerable weaknesses of the evidence arrayed against defendant, this is a case in which a remand is appropriate so that the trial court can properly evaluate *all* of the evidence before rendering a final judgment on whether a new trial is warranted. This is a truly difficult and perplexing case, which makes it even more important that the trial court itself *first* consider the evidence in light of our clarification of the *Cress* test.

Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                      No. 140147

JAMES EUGENE GRISSOM,

        Defendant-Appellant.

_____

ZAHRA, J. (*concurring in part and dissenting in part*).

I concur with the majority that the four-part test set forth in *People v Cress*[1] is used to determine whether a defendant has established entitlement to a new trial, and I further concur that newly discovered evidence that impeaches a witness may, in rare cases, be grounds for a new trial if it satisfies the *Cress* test. Specifically, I agree that a material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial, but I strongly disagree that "it may be of a general character and need not contradict specific testimony at trial." *Ante* at 2. Rather, I believe that new impeachment evidence could make a different result probable on retrial only if it directly contradicts material trial testimony in a manner that tends to exculpate the defendant.[2] Because I do not believe that defendant's new impeachment evidence satisfies the *Cress* test in this case, I dissent from the majority's application of

_____

[1] *People v Cress*, 468 Mich 678; 664 NW2d 174 (2003).

[2] See, e.g., *People v Armstrong*, 490 Mich 281, 291-292; 806 NW2d 676 (2011).

the *Cress* test and its decision to remand this case to the trial court to again address this issue. The new evidence offered to impeach the complainant does not contradict *any* of her testimony at trial or address in any manner the events in this case. More importantly, this case did not hinge on the complainant's uncorroborated account of this assault. Substantial independent evidence at trial corroborated the complainant's testimony that defendant raped her:

- The complainant identified defendant after reviewing 7,800 photographs at a police station over the course of four to five days.

- Defendant worked at the very Meijer store in whose parking lot the rape occurred, and his shift began shortly after the rape.

- The complainant described a "gold nugget" ring that her attacker wore and used to rape her, and defendant pawned just such a ring *a mere four days after the rape*, but then denied to the police that he had ever owned such a ring until presented with evidence that he had pawned it.

- The complainant described a skull tattoo that defendant had on his upper right arm, a tattoo that was not visible when defendant was wearing his Meijer uniform.

- Defendant radically altered his appearance shortly before a lineup, to such an extent that the police officer who had seen defendant *earlier that day* to tell him about the lineup could not recognize him.

- Medical and lay testimony reflected that the complainant suffered injuries to her face, shoulder, neck, arms, thighs, and vagina that were consistent with her testimony that defendant had beaten and raped her.

In my view, the majority fails adequately to account for this independent evidence in concluding that a remand is required to determine whether a different result is probable on retrial. Consider what a jury would have to believe in order to find that the complainant fabricated her rape claim. The jury would have to be convinced that the complainant, in perpetrating her false claim, spent four to five days at the police station

2

looking at nearly 8,000 photographs and then was somehow able to select a person who (1) worked at the Meijer store at which complainant claimed the rape occurred, (2) began his shift shortly after the time of the alleged rape, (3) happened to own a gold nugget ring just like the one the complainant described, (4) happened to pawn that ring a few days after the alleged rape, (5) subsequently denied pawning the ring until presented with evidence that he did so, and (6) happened to have a skull tattoo on his upper right arm as complainant described.  Not only would the jury have to believe all of this, but it would also have to conclude that defendant, despite his innocence, chose for some reason to alter his appearance by shaving his head and beard before a lineup.  And a jury would also have to discount lay and medical testimony regarding the complainant's multiple injuries that were consistent with the beating and rape that she described.

In light of the substantial evidence that did not depend on the complainant's credibility, I cannot conclude that a jury on retrial would probably acquit defendant on the basis of the new impeachment evidence.  The trial court did not abuse its discretion by denying defendant's motion for a new trial.  Accordingly, I would affirm the trial court's decision.

ANALYSIS

A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion.[3]  An abuse of discretion occurs only when the trial court's decision

---

[3] *Cress*, 468 Mich at 691.

falls outside the range of reasonable and principled outcomes.[4]  "A mere difference in judicial opinion does not establish an abuse of discretion."[5]

The majority correctly articulates the four-factor test that must be met before a new trial may be granted on the basis of newly discovered evidence:

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.[6]

This test has existed in our caselaw for more than a century.[7]  The only factor in dispute here is whether the new evidence makes a different result probable on retrial.[8]

In *Spray v Ayotte*, this Court explained, "Ordinarily a new trial will not be granted because of newly discovered evidence to impeach a witness."[9]  Subsequent cases have

---

[4] *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008).

[5] *Cress*, 468 Mich at 691.

[6] *Id.* at 692 (quotation marks and citations omitted).

[7] See, e.g., *Canfield v City of Jackson*, 112 Mich 120, 123; 70 NW 444 (1897); *People v Pizzino*, 313 Mich 97, 110; 20 NW2d 824 (1945).

[8] The prosecution conceded in the trial court that defendant had satisfied the other three factors.  Therefore, I agree with the majority that we should not consider the prosecution's argument, presented for the first time in this Court, that the newly discovered evidence is cumulative.  In any event, the prosecution's argument regarding that factor lacks merit given that the new evidence contains information that goes beyond the evidence presented at trial.

[9] *Spray v Ayotte*, 161 Mich 593, 595; 126 NW 630 (1910), quoting 29 Mack, Cyclopedia of Law & Procedure, p 918.

4

applied this principle in the criminal context.[10]  I agree with the majority that our caselaw

has not characterized this principle as a strict, per se rule prohibiting the grant of a new

trial because of newly discovered impeachment evidence, even though some Court of

Appeals panels have apparently treated it as such.[11]  Rather, the principle enunciated in

*Spray* simply recognizes that it is only in rare cases that newly discovered impeachment

evidence will satisfy the traditional four-factor test for granting a new trial.[12]

The question thus arises regarding what unusual circumstances could permit newly

discovered impeachment evidence to satisfy the *Cress* test.  This Court in *Spray* cited the

Cyclopedia of Law and Procedure, which delineates the exceptions to the general rule:

> Ordinarily a new trial will not be granted for newly discovered
> evidence to impeach a witness.  Thus evidence to show that a witness had
> made statements inconsistent with his testimony or to contradict him on
> immaterial or collateral matters is seldom ground for a new trial.  But
> evidence of contradictory statements made by a witness on whose
> testimony a doubtful verdict was founded has sometimes been held
> sufficient cause for setting aside the verdict.  Newly discovered evidence to
> successfully contradict a witness upon a material matter may be cause for

---

[10] See, e.g., *People v Serra*, 301 Mich 124, 133; 3 NW2d 35 (1942) ("A new trial will not
ordinarily be granted because of newly-discovered evidence to impeach a witness."),
citing *Spray*, 161 Mich 593.

[11] See, e.g., *People v Davis*, 199 Mich App 502, 516; 503 NW2d 457 (1993).  As the
majority observes, the case to which these decisions can be traced back, *Graham v
Inskeep*, 5 Mich App 514; 147 NW2d 436 (1967), used language consistent with the
*general* rule disfavoring new trials based on newly discovered impeachment evidence,
thereby leaving open the possibility that a new trial may be granted in unusual
circumstances.

[12] See, e.g., *Kube v Neuenfeldt*, 353 Mich 74, 82-83; 90 NW2d 642 (1958) (concluding
that newly discovered evidence did not warrant a new trial when it was "merely
cumulative" and "offered solely to impeach the testimony of" a witness); *United States v
Quiles*, 618 F3d 383, 391-392 (CA 3, 2010).

5

allowing a new trial, and it is no objection to such allowance that the evidence may incidentally impeach a witness.[13]

Thus, newly discovered evidence that contradicts particular and material statements in a witness's testimony could potentially satisfy the four factors for granting a new trial, as opposed to newly discovered evidence that only serves to impeach a witness's credibility.[14]

Both federal and Michigan caselaw support this explanation for when a new trial is warranted.  For example, in *United States v Saada*, a prosecution witness who testified pursuant to a cooperation agreement with the government was later caught on tape urging another individual to falsely implicate an innocent person *in another case* in order to receive a reduced sentence on a pending charge.[15]  The defendants sought a new trial on the basis of this new evidence.[16]  The United States Court of Appeals for the Third Circuit concluded that the new evidence did not satisfy the requirements for granting a

---

[13] 29 Mack, Cyclopedia of Law & Procedure, pp 918-921.

[14] Contrary to the majority's assertion, I have accurately described the principles enunciated in the Cyclopedia.  The majority expresses disagreement with my use of the word "particular" in describing the types of material statements that must be contradicted in order to warrant a new trial.  As the majority recognizes, however, the Cyclopedia states that "[n]ewly discovered evidence to successfully contradict a witness upon a material matter may be cause for allowing a new trial, and it is no objection to such allowance that the evidence may incidentally impeach a witness."  It is difficult to discern how the majority interprets this language as referring to material statements that are somehow *not* particular.  In any event, as this opinion will discuss, federal and state authorities support the proposition that newly discovered evidence to impeach a witness could make a different result probable on retrial if it directly contradicts material testimony by that witness at trial in a manner that tends to exculpate the defendant.

[15] *United States v Saada*, 212 F3d 210, 215-216 (CA 3, 2000).

[16] *Id.* at 215.

6

new trial.[17]  In particular, the court noted that the new evidence was "only impeaching" and that there was "no exculpatory connection" between the witness's act of urging someone to falsely implicate an innocent person in another case and the defendants' crimes.[18]  Moreover, the new evidence would probably not have produced an acquittal because there was sufficient evidence of guilt independent of the witness's testimony.[19]

Relying in part on *Saada*, the Third Circuit in *United States v Quiles* summarized the general principle regarding newly discovered impeachment evidence as follows:

> [L]ong experience has shown that newly discovered evidence that is *merely* impeaching is unlikely to reveal that there has been a miscarriage of justice.  There must be something more, i.e. a factual link between the heart of the witness's testimony at trial and the new evidence.  This link must suggest directly that the defendant was convicted wrongly. . . .  When this connection is not present, then the new evidence is merely impeaching and its revelation does not warrant granting a new trial.[20]

Therefore, "[w]hen asked to grant a new trial solely on the basis of new impeachment evidence, a court carefully should examine whether the defendant has demonstrated the necessary exculpatory connection between the evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence."[21]  The exculpatory connection must be "strong."[22]  Moreover, "[d]etermining

---

[17] *Id*. at 216.

[18] *Id*.

[19] *Id*. at 217.

[20] *United States v Quiles*, 618 F3d 383, 392.

[21] *Id*.

[22] *Id*. at 395.

7

the strength and importance of the exculpatory connection or the significance of the newly discovered evidence with respect to the credibility of critical evidence given at the trial is a difficult task that is left in the first instance to the discretion of the [trial] court."[23]

Recently, in *People v Armstrong*, we applied a similar analysis in the analogous context of a claim of ineffective assistance of counsel.[24] In *Armstrong*, the defendant's attorney failed to introduce cellular telephone records that revealed the complainant's frequent attempts to contact the defendant after his alleged rapes.[25] In concluding that the defendant was prejudiced by this failure, we acknowledged that the complainant's credibility at trial had been challenged in various ways, including with evidence that she had falsely accused another person of rape on a prior occasion.[26] "Although unquestionably significant, such attacks had less of a tendency to undermine the complainant's credibility than the cell phone records, which would have provided documentary proof strongly suggesting that the complainant lied to *this* jury regarding her actions in connection with the alleged rapes in *this* case."[27] That is, "[t]he cell phone records revealing frequent communication with defendant following the alleged rapes would have cast serious doubt on the *substance* of her accusations."[28]

---

[23] *Id*. at 393.

[24] *Armstrong*, 490 Mich 281.

[25] *Id*. at 286-287.

[26] *Id*. at 291.

[27] *Id*.

[28] *Id*. at 291-292 (emphasis added).

In light of these authorities, I conclude that newly discovered evidence to impeach a witness could potentially make a different result probable on retrial if it directly contradicts material testimony by that witness at trial in a manner that tends to exculpate the defendant. By contrast, new evidence that merely impeaches a witness on a collateral or immaterial matter, unrelated to the substance of the charges in the case at hand, lacks the requisite exculpatory connection to warrant a new trial.

In this case, defendant has failed to establish an exculpatory connection between the newly discovered evidence and the offense at issue. The new evidence consists primarily of police reports concerning events that occurred in California more than four months *after* the rape in this case.[29] The police reports contain no information that contradicts or even addresses the complainant's testimony at trial regarding the rape that occurred in this case. Thus, because the reports do not contradict *any* evidence presented at trial, let alone *material* evidence, an exculpatory connection simply does not exist.

What the California police reports do contain can only be described as a confusing series of hearsay statements attributed to the complainant regarding other purported sexual assaults that occurred at various points in her life, including during her trip to California and during her childhood. Some of the hearsay statements are secondary or tertiary hearsay within hearsay. Although the reports suggest that the complainant retracted her accusation regarding an alleged assault in Colorado on her way to California and also retracted a claim that she was kidnapped in California, the record contains no

---

[29] The complainant did not initiate the California police reports, but she did initiate a police report in Michigan three years later reporting alleged childhood abuse, which led to the discovery of the California reports.

direct evidence of falsity regarding the other alleged sexual assaults. It is thus not clear on what grounds the vast majority of the purported accusations would be admissible on retrial. Nor is it apparent on what theory the evidence of sexual-assault claims that occurred *after* the rape in this case would be admissible. Although a "defendant should be permitted to show that the complainant has made *false* accusations of rape *in the past*,"[30] no established theory of relevance has been identified for the admission of *subsequent* allegations of rape or of allegations for which *no evidence of falsity has been presented*.[31] Also, the reports contain no evidence of the complainant's sexual conduct that would be probative of bias or an ulterior motive to make a false charge.[32]

In her concurrence, Justice MARILYN KELLY aggregates the newly discovered hearsay evidence to engage in a speculative enterprise that would grant a new trial on the basis of evidence that might never even be admitted—and indeed might not even be admissible—at trial. However, when considering whether newly discovered evidence

---

[30] *People v Hackett*, 421 Mich 338, 348; 365 NW2d 120 (1984) (emphasis added).

[31] Although the complainant did not report *to the police* the sexual nature of the assault in this case until more than a year later, i.e., after the events reflected in the California police reports, she did report the rape to at least four individuals within mere days of the assault. In particular, the complainant told her gynecologist and a friend about both the penile and digital penetrations within a few days of the assault, and she told her husband and an emergency room physician about the digital penetration within days as well. Thus, the alleged statements regarding sexual assaults contained in the California police reports, other than the vague references to childhood abuse, occurred *after* the rape in this case and *after* the complainant had reported the rape to at least four people. In no sense, then, has evidence been presented of any *false* accusations of rape *in the past* that may be admitted under *Hackett*.

[32] *Id*.

10

satisfies the *Cress* standard, the reviewing court should only consider admissible evidence.[33]

Even assuming, however, that the substance of the California police reports is somehow relevant and could be admitted, it is not clear whether a jury would find that this new evidence undermines the complainant's credibility to such an extent that the jury would disbelieve her testimony that defendant had raped her in Michigan four months earlier. Whatever exculpatory theory defendant might offer to explain the newly discovered evidence,[34] he simply has not established that a jury would more likely accept that theory than the prosecution's explanation, which is that the rape *in this case* caused the complainant to suffer from an emotional trauma that led to her subsequent actions in California. The prosecution explained this theory at the hearing on defendant's motion for relief from judgment or a new trial:

> I would represent to the Court, I followed up on that when I received this material and I talked to an expert in the area of mental health and gave them the scenario and asked specifically: Is this unusual? Because that's what the defense has been representing to the Court here this morning, that this is outrageous, this is just unheard of that something like this would happen four to five months after a rape. But what this professional tells me is it's not unusual at all. You've got a victim suffering from Post

---

[33] See, e.g., *People v Martin*, 116 Mich 446, 453; 74 NW 653 (1898) (stating that a motion for a new trial was properly denied because the evidence on which the motion was based "was hearsay"); *People v Borowski*, 330 Mich 120, 128; 47 NW2d 42 (1951) (applying *Martin* to deny a new trial requested because of newly discovered evidence that "was based wholly on hearsay").

[34] For example, Justice MARILYN KELLY's concurrence develops an exculpatory defense theory that the complainant may have engaged in a "scheme" to make false rape accusations. *Ante* at 4. In considering this theory, I note that there is no evidence that the complainant fabricated her rape claim against defendant. She has never retracted her testimony regarding the rape in this case.

11

Traumatic Stress Disorder. She's not been able to deal with what happened to her in that parking lot at Meijer. It hasn't been resolved. It hasn't even been reported to critical key people and so she's decompensating and that's what he told me and I fully expect, your Honor, had we had to hash this out in front of a jury, that not only he but other experts would come in and support that suggestion that this is not unusual behavior but, in fact, it corroborates what happened to her. It reinforces the fact that she had been through a traumatic experience in May of that year, which ultimately led to this behavior.

In short, it is far from obvious that any exculpatory defense theory would be more believable to a jury than the prosecution's theory that the rape caused an emotional trauma leading to the events in California. Remember, it is *the defendant's* obligation to satisfy the *Cress* factors,[35] including the fourth factor requiring that "the new evidence makes a different result *probable* on retrial."[36] Given that defendant has failed to articulate why a jury on retrial would more likely believe an exculpatory defense theory over the prosecution's alternative theory that is consistent with defendant's guilt, the fourth *Cress* factor has simply not been satisfied, and defendant is not entitled to a new trial.[37]

---

[35] *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012).

[36] *Cress*, 468 Mich at 692 (emphasis added).

[37] Defendant notes that the new evidence includes a purported hearsay statement by the complainant allegedly reporting a rape in a parking lot in California that was similar to the rape in this case. It is not clear, however, that any similarity would cut in favor of the defense's theory and against the prosecution's theory. According to the National Institute of Mental Health, flashbacks are a common side effect of a form of posttraumatic stress disorder that may result from a rape. "A person having a flashback may lose touch with reality and believe that the traumatic incident is happening all over again." <http://www.nimh.nih.gov/health/publications/anxiety-disorders/complete-index.shtml#pub4> (accessed July 30, 2012). The Rape, Abuse & Incest National Network indicates: "A flashback is when memories of past traumas feel as if they are taking place in the current moment. Many survivors of sexual violence experience these emotional returns to the trauma, believing themselves to be back at the

Further undermining any exculpatory defense theory is that substantial independent evidence of guilt corroborated the complainant's testimony that defendant raped her.[38] The trial in this case was not a simple "he said/she said" credibility contest.

scene of the attack or abuse." <http://rainn.org/effects-of-sexual-assault/flashbacks> (accessed July 30, 2012). Moreover,

> [f]lashbacks can be triggered by many stimuli, such as sensory or emotional feelings. It can sometimes feel as though flashbacks come from nowhere, making it difficult to distinguish between past and present. They can often leave the survivor feeling anxious, scared, powerless, or any other emotions they felt at the time of their assault.
>
> Some flashbacks are mild and brief, a passing moment, while others may be powerful and last a long time. Many times the individual does not even realize that s/he is having a flashback and may feel faint or dissociate. [*Id.* (citation omitted).]

Thus, given this possible explanation for the complainant's hearsay statement in California describing an incident similar to the rape in this case and the prosecution's representation that it has an expert who would support a theory that the complainant was suffering from posttraumatic stress disorder, defendant has failed to establish that the admission of the complainant's statement would tend to support the defense theory.

[38] Even under the less demanding standard for establishing a violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963)—which does not apply here because it is undisputed that no *Brady* violation occurred—"[t]he force of impeachment evidence . . . is diminished when the witness's testimony is supported by substantial corroborating evidence or when the impeachment evidence is cumulative or collateral," *United States v Ramos-Gonzalez*, 747 F Supp 2d 280, 291 (D PR, 2010), citing *United States v Connolly*, 504 F3d 206, 217 n 6 (CA 1, 2007); see also *Smith v Cain*, 565 US ___; 132 S Ct 627, 630; 181 L Ed 2d 571 (2012) ("We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."). Moreover, it is widely recognized that the *Brady* standard is *more* "defendant-friendly" than the standard for granting a new trial on the basis of newly discovered evidence. See, e.g., *United States v Agurs*, 427 US 97, 111; 96 S Ct 2392; 49 L Ed 2d 342 (1976); *Connolly*, 504 F3d at 212; *United States v Frost*, 125 F3d 346, 382 (CA 6, 1997); *United States v Duke*, 50 F3d 571, 576-577 (CA 8, 1995); *United States v Johnson*, 380 F Supp 2d 660, 678 (ED Pa, 2005). Thus, even under a *more* defendant-friendly standard for granting a new trial than the one that

When testifying regarding the beating and the digital and penile penetrations by the use of force that defendant committed after he approached her minivan in a Meijer parking lot, the complainant described a "gold nugget" ring, containing several small stone chips and ridges, that defendant inserted into her vagina with the middle finger of his left hand during the assault. When questioned by the police, defendant initially denied that he had ever owned *any* jewelry, including a gold nugget ring. But when presented with evidence that he had pawned a gold nugget ring at a business called The Hock Shop a mere four days after the alleged rape, defendant admitted that he had indeed pawned the ring there. The owner of The Hock Shop identified defendant at trial as the person who pawned the ring four days after the rape, and the owner's records confirmed that defendant did so.[39]

In addition, defendant worked at the Meijer store in whose parking lot the rape occurred. His shift started shortly after the rape. Defendant also had a skull tattoo on his upper right arm that would not have been visible when he was wearing his Meijer uniform. The complainant identified such a tattoo when describing defendant, stating that she saw part of the tattoo during the assault. A Meijer employee testified that

_____

applies here, it is recognized that the force of impeachment evidence is diminished when the witness's testimony is supported by strong corroborating evidence.

[39] Defense counsel suggested at oral argument that defendant might have forgotten that he owned the ring. But given that defendant initially denied to the police not merely that he had owned such a ring but that he had ever owned *any jewelry whatsoever*, it seems unlikely that a jury would believe that defendant entirely forgot that he once owned a gold nugget ring and then pawned it.

employees are not required to wear their uniforms on the way to work; they are permitted to wear street clothes and then change when they arrive.[40]

---

[40] Although portions of the Meijer parking lot were subject to surveillance video, the officer who reviewed the tapes testified that "[t]hey're absolutely poor quality. You couldn't see -- just barely make out the cars themselves. Poor quality, we could not see anything on the tapes." Also, a Meijer employee acknowledged that there were areas of the parking lot that the cameras did not cover and that it was difficult to identify people the further they were from the doors. The complainant testified that she parked between two vehicles, "quite a ways from the doors." Further, the video of the parking lot is displayed inside the Meijer store. Thus, defendant, a Meijer employee, could have regularly watched the video to determine whether a particular area of the parking lot was covered by the cameras. As the prosecutor observed during closing argument, defendant "knew that parking lot. He knew that store. He knew what the video showed and what it didn't show. And when he found his vulnerable victim, he took his chance."

On a related note, although defendant notes that the attack occurred in a parking lot in daylight hours and that no one reported seeing the assault, the circumstances of the assault reflect that defendant took steps to minimize the chance of the complainant's being seen or heard by others. The complainant, who was getting out of her minivan when defendant attacked her, testified that she fell back into her vehicle after defendant punched her face with his fist. She then fell farther back into the vehicle when he hit her again, causing her to lose consciousness with her head between the two front bucket seats of the vehicle. After the complainant regained consciousness and tried to sit up, defendant pulled her pants and underwear down around her knees. When the complainant saw defendant's erect penis and realized what was going to happen, she tried to sit up partway, but defendant hit her several times in the chest and collarbone to knock her back down, calling her "a stupid bitch." Defendant then stated, "[T]his will shut you up" and, after sliding his ridged gold nugget ring to the middle knuckle of his finger, inserted his finger and the ring into her vagina. Reacting to the pain, the complainant called defendant a "bastard," and in response defendant cut her face by striking her with the back of his hand. The complainant tried to scream, but it was difficult for her to breathe because of having been struck several times in the chest, which knocked the wind out of her. After defendant inserted his penis into the complainant's vagina, she again lost consciousness.

Thus, given that (1) the attack occurred largely inside the complainant's vehicle, into which defendant had pushed her and which was parked between two other vehicles "quite a ways from the doors," and (2) defendant's repeated battering of the complainant rendered her unconscious for part of the assault and made it difficult for her to breathe or scream, the evidence indicates that defendant's own actions decreased the likelihood that anyone would see or hear the complainant as he beat and raped her.

15

The complainant identified defendant after looking at 7,800 photographs at the police station over a period of four to five days. The first 6,800 photographs that she reviewed were contained in eight loose-leaf books. The books did not contain any identifying information regarding the persons in the photographs. She then looked at approximately 1,000 photographs in digital format on a computer. The digital format also did not reveal any identifying information about the persons shown. An officer testified that after the complainant had reviewed approximately 1,000 digital photographs, she became "quite emotionally upset, left the computer, went into a separate room crying and very visibly emotionally upset." She then informed the officer that she had found the picture of the man who attacked her. Defendant was the person depicted in the photograph. The picture was taken a little more than two months after the rape in this case.

A lineup was then held. On the morning of the lineup, an officer went to defendant's house to tell him to appear for the lineup. When the officer saw defendant at his house that morning, he had "long hair, the long goatee-type, scraggly-looking beard. Unkept [sic]. He looked very unkept [sic]." Later that day, the officer went to the police station lobby to get defendant for the lineup. The officer testified: "There was [sic] several people sitting around in the lobby and I went back in, he wasn't -- I said he wasn't there. I didn't recognize him in the lobby." The officer then learned that defendant actually had been sitting in the lobby when the officer went to look for him. The officer had not recognized defendant in the lobby because "[h]e had shaved all of his hair off, all of his facial hair, completely, completely changed the way I'd seen him hours earlier." A second officer who had seen a photograph of defendant also looked for him in

the lobby, saw several people, and "didn't believe he was there." The second officer explained that she did not recognize defendant because "[h]e appeared very different from the photograph that I had seen of him." In particular, when he arrived for the lineup defendant "was pretty well clean-shaven, his head, his face." He also appeared heavier than in the photograph.[41]

In addition to this independent evidence of defendant's guilt, evidence of the complainant's behavior and physical condition following the attack corroborated her testimony. The complainant's husband testified that when she returned from Meijer that day, she looked panicked and terrified. She also had a cut near her mouth. The complainant immediately went to her bedroom.[42] When her husband followed her into the bedroom and asked her what had happened, the complainant "was quite upset. She had a hard time finishing any sentences. Just kind of incoherent, rambling."[43] Within the next day or two, the complainant's husband saw large bruises on both of her arms and legs, including on her thighs. The complainant was still very upset when she went to the emergency room four days after the assault, and she had difficulty relating the event.

---

[41] Just like the police officers who were unable to identify defendant before the lineup, the complainant was also unable to identify defendant after he changed his appearance for the lineup.

[42] The complainant testified that she went to the bedroom because her children were sitting in the kitchen and she did not want them to see her.

[43] According to the complainant, she did not tell her husband about the sexual nature of the assault at that point because "I wasn't ready to face [it] myself. And I didn't know how to break his heart." Three days later, she told her husband about the digital penetration, but she did not disclose the penile penetration because "it was obvious he was in pain thinking about [the digital penetration]. I could see what I was doing to him and I couldn't go any further."

17

Also, the police officer who took the initial report two days after the assault saw a large scratch on the complainant's face and bruises on her shoulder. He testified that she was complaining of soreness on her chest, arms, and "pretty much all over."[44] A friend whom the complainant had told about the rape three days after it occurred testified that the complainant was "very slow in speaking," distant, and fearful.

The complainant first went to the emergency room two days after the assault. She did not disclose the sexual nature of the assault at that time but was treated for injuries to her left shoulder, neck, and arm.[45] Her left arm was bruised and swollen and was placed in a sling. Two days later, the complainant called her gynecologist and reported that she had been sexually assaulted and wanted a full exam because she was growing worried about possible repercussions given that her assailant had not used a condom. She told the gynecologist about the penile penetration. The gynecologist directed the complainant to go back to the emergency room. Later that day, the complainant returned to the emergency room and reported the digital penetration but not the penile penetration.[46] A

---

[44] The complainant did not tell the officer about the sexual nature of the assault at this point because "I hadn't told my husband. I couldn't imagine him hearing it from someone else. And I wasn't comfortable. Admitting it to [the officer] would be admitting it to myself."

[45] The complainant testified that she did not disclose the rape during this first visit to the emergency room because she was in a room with six other beds and because she had already taken a shower and did not think anything could be done.

[46] The attending physician, a male, acknowledged that not all patients are comfortable with him and that female victims are sometimes uncomfortable telling male physicians about being raped. The physician further explained that he had "seen more alleged rape victims seen [sic] at a later time than at the time that the rape was committed" and that "[i]t's not unusual to obtain more and more information as the patient opens up to the matter to gain more information as the days progress."

18

full rape kit was not prepared because only a digital penetration was reported and four days had passed since the assault. The complainant reported vaginal pain. An examination revealed internal abrasions on the right side of the vagina and the cervical area deep in the vagina. The attending physician testified that although other explanations were possible, his findings were consistent with a forceful digital penetration and a forceful penile penetration.

Eleven days after the rape, the complainant saw her gynecologist, who testified that the complainant was anxious and depressed. An examination revealed abrasions and scratches along the inner labia. The vaginal area was normal, but "[t]he vaginal area heals very quickly. So over a matter of a few days those would probably no longer be visible." Abrasions that had occurred 11 days earlier would have been "healed by that point." The gynecologist also observed "obvious" bruises on the complainant's arms and inner legs.

More than a year later, the complainant told the police about the sexual nature of the assault after she saw someone in a car behind her who matched the description of her assailant. The complainant explained that she went to the police because she felt "stronger" at that point and "wasn't willing to live in fear anymore. I was ready to do what I needed to do. To get the person off the street who hurt me and changed my life."[47]

---

[47] The complainant testified at the preliminary examination that she could identify a ring on the hand of the person in the car behind her, and she then explained at trial that she "identified that ring as being in the same position on his hand as the ring the day I was assaulted." She did *not*, however, testify that it was the *same* ring as the one worn during the assault. As the prosecutor explained at oral argument, the point of this testimony was not to establish that defendant *actually* was the person driving behind her that day or that the person was wearing the same ring that defendant was wearing on the day of the

It was then that she reviewed the 7,800 photographs at the police station and identified defendant.

It is noteworthy that, as the Court of Appeals majority observed, defendant had already impeached complainant's credibility at trial

> by pointing out that she did not immediately report the nature of the attack and further, that her descriptions of the attack, while not wholly inconsistent, were incremental in the manner that she released the information to her husband and to the authorities. The [California] police reports of events that took place *after* the victim told several people that she had been raped and *after* objective evidence thereof had been obtained does not cast much doubt on events that took place several months earlier in Michigan.[48]

In short, defendant has not established that a different result is probable on retrial because (1) the newly discovered evidence does not contradict any material (or, for that matter, immaterial) evidence presented at trial or pertain in any way to the offenses committed in this case, (2) the complainant had already been impeached in various ways at trial regarding her failure to immediately report the nature of the attack, and (3) significant objective evidence corroborates complainant's testimony that defendant raped her. As the Court of Appeals majority explained:

---

assault, but that the complainant's observation of a person matching defendant's description was what led her to report the sexual nature of the assault to the police.

[48] *People v Grissom*, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2009 (Docket No. 274148), p 10. The Court of Appeals majority's reasoning is consistent with the principle, discussed in the less demanding *Brady* context, that "[i]mpeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist when that evidence is cumulative or collateral." *United States v Sanchez*, 917 F2d 607, 618-619 (CA 1, 1990) (citation and internal quotation omitted); see also *Connolly*, 504 F3d at 217.

[T]he significant objective evidence – defendant's presence in the vicinity of the crime, the victim's description of defendant's tattoo and ring, defendant's denial that he owned the ring, defendant's pawning of the ring only four days after the attack, the victim's identification of defendant's picture, defendant's radical change in appearance during the short time between being told to attend a lineup and his appearance therein, and medical evidence of injuries consistent with a sexual assault – did not involve the victim's credibility and were legally sufficient to support defendant's convictions. Moreover, none of it is affected in any way by the California police reports.[49]

To reach a different result on retrial, then, a jury would have to conclude not merely that the complainant fabricated her rape claim, but that after going through 7,800 photographs, she found the proverbial needle in the haystack, somehow choosing a photograph of an innocent man who coincidentally (1) worked at the location of the alleged rape, (2) was in the vicinity at the time, (3) had a ring like the one she described, (4) pawned the ring four days later, (5) subsequently denied ever owning such a ring or, for that matter, any jewelry, (6) had a skull tattoo on his right upper arm like the one she described, and then (7) inexplicably shaved his head and beard right before a lineup.[50]

_____

[49] *Grissom*, unpub op at 10 n 16.

[50] Or as the prosecutor stated during closing argument at trial:

> Lots of people have skull tattoos on their right upper arm who work at Meijer with a gold nugget ring who were working that day? I don't think so. And I trust your reason and logic and common sense in assessing that testimony. There could be dozens of people walking around with skull tattoos, but not there, not working at Meijer, not with a gold nugget ring. And not in the 7800 photographs that [the complainant] picked this Defendant out of.

> \* \* \*

> . . . It's not a coincidence. You can't explain it away. She picks out that photograph from nearly 8,000. He works at Meijer. He's working an hour and a half after this happened. He's got a ring. He's got the tattoo exactly where she said it was. You can't explain away that evidence.

21

And this conclusion must be reached despite the complainant's medically documented injuries that were consistent with a rape and a beating.

We must not overlook that our review of this issue is deferential. It was the trial court, not the members of this Court, who tried the case and heard the evidence and thus was "without question . . . in the best position to determine if the new [evidence] would tend to produce a probable different result on a retrial."[51] The trial court possessed a superior ability to assess in the first instance the strength and importance of the newly discovered evidence in relation to the evidence presented at trial.[52] The majority states that the trial court abused its discretion by denying a new trial because it erroneously believed that impeachment evidence could never be the basis for a new trial. However, the trial court also took note of the significant evidence of guilt that was independent of the complainant's testimony:

> Finally, this Court takes strong exception to defense counsel's version of the facts that came out at trial for the jury's consideration as contained in his Motion for a New Trial. The statement of facts as contained in the Prosecutor's brief on this motion is much closer to my remembrance of the trial evidence. My point in commenting on this is that

[51] *Graham*, 5 Mich App at 524.

[52] See *Quiles*, 618 F3d at 393 ("Determining the strength and importance of the exculpatory connection or the significance of the newly discovered evidence with respect to the credibility of critical evidence given at the trial is a difficult task that is left in the first instance to the discretion of the [trial] court."). In her separate concurring opinion, Justice MARILYN KELLY says that the judge who tried this case has now retired, that a new judge will be assigned on remand, and that my discussion of the deference owed to the trial court is thereby unfounded. But as my analysis makes clear, I am deferring to the *original* trial judge who *already* denied defendant's motion for new trial; this is *the very same judge* who tried the case and heard the evidence. Thus, it is entirely appropriate to accord deference to the trial court. I also note that it is not uncommon for a retired judge to be temporarily assigned to address a matter on remand.

22

there was ample and strong competent evidence for the jury to convict Defendant independent of [the complainant's] testimony.

This conclusion regarding the independent evidence of guilt fell within the range of reasonable and principled outcomes and fully supports the decision to deny a new trial. Therefore, to the extent that the trial court also based its decision in part on an erroneous line of Court of Appeals caselaw, reversal is not required. "A correct result may be reached and affirmed, although based on a wrong reason."[53]

Finally, the majority cites no authority for its assertion that "[t]he only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record." *Ante* at 23. Whatever the merits of this unsupported assertion,[54] it is difficult to square with Justice MARILYN KELLY's concurrence, in which she opines that "the newly discovered evidence has evidentiary value because, on trial, it may permit defendant access to the complainant's medical, counseling, and psychological records," including the complainant's rape-support-group

---

[53] *People v Cooper (On Rehearing)*, 328 Mich 159, 162; 43 NW2d 310 (1950); see also *Klooster v City of Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011). The majority inexplicably ignores this alternative basis on which to affirm the trial court's decision. Indeed, the majority fails even to acknowledge, let alone apply, the widely recognized and entirely uncontroversial principle that a correct result may be affirmed even if reached for an incorrect reason. It is not clear why the majority declines to affirm on this alternative ground.

[54] In *Cress*, 468 Mich at 685, this Court noted that the trial court in that case had granted the prosecution's motion to reopen proofs regarding the defendant's motion for a new trial. In my view, the majority's language here should not be read to preclude when appropriate the possible reopening of the record as discussed in *Cress*. I express no definitive view on this point with respect to this case because I conclude that a different result is not probable on retrial given the facts presented in the newly discovered evidence and at the original trial.

23

records. *Ante* at 5. *None* of those records are part of the newly discovered evidence, nor are they in the record. Thus, *under the majority's own opinion*, consideration of those records would appear to be entirely off limits in deciding the motion for new trial.

CONCLUSION

In conclusion, I concur that the *Cress* test is used to determine whether a defendant is entitled to a new trial and that new impeachment evidence may, in rare cases, satisfy the *Cress* test. In particular, I agree with the majority that a material exculpatory connection must exist between the new impeachment evidence and significantly important evidence presented at trial, but I strongly disagree that such new evidence "may be of a general character and need not contradict specific testimony at trial." *Ante* at 2. New impeachment evidence could make a different result probable on retrial only if it directly contradicts material trial testimony in a manner that tends to exculpate the defendant. I respectfully dissent from the majority's application of the *Cress* test and its decision to remand this case to the trial court. The trial court reached a reasonable and principled outcome by denying a new trial because the new impeachment evidence here does not make a different result probable on retrial. I would therefore affirm the trial court's decision.

Brian K. Zahra
Robert P. Young, Jr.
Mary Beth Kelly

24